IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Lisa Wooden, | Case No. 3:11 CV 525 |
|     Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | |
| Alcoa, Inc., et al., | JUDGE JACK ZOUHARY |
|     Defendants. | |

## INTRODUCTION

This case involves a dispute over employment benefits governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Plaintiff Lisa Wooden was a beneficiary under a benefit plan administered by Defendants Alcoa, Inc. and Aetna Corp. (Doc. No. 35-2 at 3 and 5). Plaintiff claims Defendants wrongfully terminated her benefits (Doc. No. 1 at 7). Defendants argue Plaintiff is ineligible to receive benefits, and counterclaim seeking reimbursement for overpayment of benefits (Doc. No. 4 at 7–9). This Court is called upon to resolve these claims on dueling Motions for Summary Judgment (Doc. Nos. 33 and 35).

## BACKGROUND

### The Employee Group Benefits Plan

Defendant Alcoa is a leading producer of aluminum products. Plaintiff was a production technician for Defendant Alcoa, responsible for loading parts and repairing machines (Doc. No. 36-5 at 28). Plaintiff enrolled in Alcoa's employment benefits plan, which included long-term disability coverage (the "Plan") (Doc. No. 35-2 at 2).

The Plan entitled Plaintiff to long-term disability benefits if she was "totally disabled" (Doc. No. 38-3 at 29), which means (Doc. No. 38-3 at 39):

- for the first 24 months, you cannot perform each of the material duties of your regular job [the "own occupation" standard]; and

- after the first 24 months, you cannot perform each of the material duties of any gainful occupation for which you are reasonably suited by training, education, or experience [the "any occupation" standard].

Plaintiff would receive a percentage of her former wage until age 65 as long as she met those requirements (Doc. No. 38-3 at 29).

Alcoa, responsible for administering the Plan, "has the discretionary authority to determine eligibility under all provisions of the plans; . . . interpret plan provisions for all participants and beneficiaries; and decide issues of credibility . . . ." (Doc. No. 38-3 at 33). Alcoa also has authority to appoint third-party representatives to administer the Plan, and did so in this case (Doc. No. 37-3 at 26). Alcoa delegated the initial review and processing of long-term disability claims to Defendant Aetna (Doc. No. 35-2 at 3).[1] Alcoa also delegated general oversight of the Plan to its internal Benefits Management Committee ("BMC"), which retained complete discretionary authority (Doc. No. 35-2 at 16 and 18).

Two levels of appeal are available after an ineligibility determination under the Plan. Aetna hears the first appeal (Doc. No. 35-2 at 18). The second and final appeal is decided by the BMC, which delegates this authority to the Benefits Appeals Committee ("BAC") (Doc. No. 35-2 at 4). The BAC consists of five Alcoa employees. While these employees participate in the Plan, they do not

---

[1] During the period of Plaintiff's disability, Defendant Alcoa used three different entities to review long-term disability claims. MetLife reviewed long-term disability claims when Plaintiff first became disabled in 2003 (Doc. No. 38-3 at 34). In 2005, MetLife was replaced by Broadspire Services, Inc. (Doc. No. 38-3 at 41). In 2007, Broadspire's disability business was taken over by Defendant Aetna (Doc. No. 35-2 at 3).

participate in Plan administration and are uncompensated for their role as committee members (Doc. No. 35-2 at 4).

Defendants have a fiduciary obligation to the Plan's participants to ensure only "totally disabled" claimants receive benefits (Doc. No. 35-2 at 4). For that reason, claimants may be required to undergo periodic medical examinations to prove continued disability (Doc. No. 35-2 at 13). Claimants must also apply for Social Security disability benefits (Doc. No. 35-2 at 14). If successful, the amount of benefits received from the Plan is reduced by the amount received from Social Security (Doc. No. 32-5 at 13). Moreover, if Social Security benefits are paid retroactively, claimants must repay "any overpayment of disability benefits . . . ." (Doc. No. 35-2 at 14).

**Plaintiff's Disability Benefits: Termination and Reinstatement**

*The "Own Occupation" Period*

Plaintiff ceased working for Alcoa on August 1, 2003, due to mid-back pain (Doc. No. 35-1 at 9). In September 2003, Dr. Cheryl Bihn diagnosed Plaintiff with a herniated disc (Doc. No. 36-1 at 17). Subsequent evaluations in 2003 and 2004 confirmed the diagnosis (Doc. No. 35-1 at 18–21). On February 7, 2004, Plaintiff began receiving long-term disability benefits under the Plan because she could not perform her regular job (Doc. No. 35-2 at 5). Throughout 2004 and 2005, Plaintiff continued to seek medical treatment for her back pain from Dr. Gregory Thomas, who treated her mostly with increased doses of medication (Doc. Nos. 36-1 at 34–36; 36-2 at 8, 25, and 41).

Plaintiff also filed -- as the Plan requires -- applications for Social Security benefits (Doc. No. 36-4 at 1). Her application was initially denied and Plaintiff requested a hearing.

3

*The "Any Occupation" Period*

In August 2005, Broadspire -- the claims administrator at the time -- initiated a review of Plaintiff's medical records to determine whether Plaintiff was still "totally disabled" (Doc. No. 36-3 at 11). Broadspire referred Plaintiff's medical records to Dr. James Wallquist, an orthopedist, who determined Plaintiff was not "totally disabled," stating (Doc. No. 36-3 at 12):

> Based on review of the medical documentation provided, there were insufficient updated quantitative objective physical findings to correlate the diagnostics and the claimant's subjective complaints to support a functional impairment from the claimant's own occupation . . . and from any occupation.

Shortly after, Dr. Thomas noted Plaintiff "says her back feels as good as it ever has since we got her up to the proper amount of pain medication." (Doc. No. 36-3 at 15). However, Dr. Thomas expressed surprise and concern when he learned Broadspire was considering terminating Plaintiff's disability benefits based on Dr. Wallquist's recommendation. Dr. Thomas found Plaintiff was "barely capable of being an independent homemaker . . . taking a rather substantial amount of pain medication in order to be able to get out of bed . . . ." (Doc. No. 36-3 at 16). Despite Dr. Thomas' concern, Broadspire terminated Plaintiff's disability benefits on October 24, 2005 (Doc. No. 36-3 at 17–18).

*Plaintiff's Appeal*

The next day, Plaintiff appealed the termination of her disability benefits (Doc. No. 36-3 at 19). In December 2005, Dr. Thomas saw Plaintiff and again disagreed with Dr. Wallquist (Doc. No. 36-3 at 22–23). Dr. Thomas prescribed Plaintiff 120 mg of Oxycodone -- three times daily -- for her back pain. He noted Plaintiff had "at least, three epidurals" and wanted to know from Plaintiff's attorney what to include in the medical evaluations to help Plaintiff's appeal (Doc. No. 36-3 at 23).

4

In January 2006, Plaintiff sought the opinion of Dr. Michael Reithmiller, who agreed with Dr. Thomas that Plaintiff "was unable to perform any remunerative employment . . . ." (Doc. No. 36-3 at 36).

On February 17, 2006, Plaintiff received her Social Security hearing (Doc. No. 36-4 at 1). The Administrative Law Judge found Plaintiff met the requirements for disability and was entitled to Social Security benefits (Doc. No. 36-4 at 4), retroactive to January 1, 2004 (Doc. No. 32 at 2).

In March 2006, as part of Plaintiff's appeal, Broadspire ordered another review of the medical records, this time conducted by orthopedic surgeon and pain specialist Dr. Ira Posner (Doc. No. 36-4 at 6–10). Dr. Posner found "no evidence . . . of a significant impairment . . . that would preclude sustained work activity at a sedentary level." (Doc. No. 36-4 at 9). Dr. Posner further found Plaintiff's complaints to be "subjective in nature . . . [un]documented by standard neuro-cognitive testing." (Doc. No. 36-4 at 9). Finally, Dr. Posner noted Dr. Reithmiller's diagnosis of Plaintiff's reduced cognitive function -- due to her daily intake of 360 mg of Oxycodone -- directly contradicted the peer reviewed literature (Doc. No. 36-4 at 10).

Nevertheless, Plaintiff's appeal was successful, and Broadspire reinstated her long-term disability benefits in April 2006 (Doc. No. 36-4 at 14–17), reminding Plaintiff that eligibility for benefits required "total disability" as defined by the Plan (Doc. No. 36-4 at 16).

Plaintiff continued to see Dr. Thomas throughout 2006 (Doc. No. 36-4 at 19–26). In August 2006, Dr. Thomas noted (Doc. No. 36-4 at 26):

> Neurologically I don't find her very impressive. She can walk on her toes and walk on her heels better than I can. . . . All we have is a subjective complaint of pain, pain and more pain. I also talked to her about reaching a point where we are not sure if her pain medication is part of the solution or part of the problem.

5

> She is taking 120mg. of Oxycodone [three times a day]. Some experts in the field of addictionology would gasp and choke with that amount and want to detox her forthwith. Interestingly after I launched into that conversation she quit complaining about how little time her pain medications work for her.

**Plaintiff's Overpayment**

In September 2006, Broadspire sent Plaintiff a letter explaining Broadspire had received notice of Plaintiff's Social Security benefits (Doc. No. 36-4 at 39–40). The letter stated that beginning on January 1, 2004, Plaintiff received $859 per month from Social Security. These additional payments resulted in a total overpayment of $22,016.20 (Doc. No. 35-2 at 6).[2] Broadspire requested repayment and informed Plaintiff the failure to repay would result in an offset of future benefits under the Plan (Doc. No. 36-4 at 39).

**Final Termination of Plaintiff's Benefits**

In April 2007, Broadspire renewed its investigation into Plaintiff's eligibility for disability benefits. Dr. Steven Sokoloski, an orthopedic surgeon, examined Plaintiff (Doc. No. 36-5 at 1–3). He diagnosed her with chronic thoracic spine pain, but ultimately concluded Plaintiff "should be able to accomplish work in the sedentary to sedentary/light physical demand level for a full eight-hour work day." (Doc. No. 36-5 at 3). Dr. Sokolski also made two important observations: (1) cogwheeling -- indicating Plaintiff did not use her full effort during the examination -- and (2) Waddell signs -- indicating at least some of her pain had no identifiable physical cause (Doc. No. 36-5 at 3).

---

[2] The original letter to Plaintiff miscalculated the overpayment as $21,501.57 (Doc. No. 36-4 at 39).

Broadspire conducted an employability assessment and a labor market survey in early 2008 (Doc. No. 36-5 at 6–19).[3] The assessments concluded Plaintiff had the capacity to work at a number of locally available jobs, each with a wage exceeding her benefit (Doc. No. 36-5 at 10 and 15). At this time, Defendant Aetna took over the investigation of Plaintiff's disability claim. Aetna concluded "there is insufficient documentation of a functional impairment that would preclude you from the job duties of any occupation." (Doc. No. 36-5 at 19). Aetna determined Plaintiff was not "totally disabled," and terminated her disability benefits on April 30, 2008 (Doc. No. 36-5 at 20).

*Plaintiff's Appeal to Aetna*

Plaintiff appealed Aetna's decision in October 2008 (Doc. No. 36-5 at 39). In support of her appeal, Plaintiff again consulted Dr. Reithmiller who, unsurprisingly, concluded Plaintiff "continues to be unable to perform remunerative employment . . . ." (Doc. No. 36-5 at 36). Dr. Reithmiller also discussed side effects from Plaintiff's medication, noting "she no longer has the ability to make judgments and decisions, compile and compare data, perform repetitive or short cycle work, or attain precise limits and standards given the drowsiness, memory impairment, and lack of the ability to focus or concentrate . . . ." (Doc. No. 36-5 at 37).

Aetna gathered all Plaintiff's medical records and sent them to three experts for review: (1) Lawrence Burstein, Ph.D., a psychologist certified by the American Board of Disability Analysts; (2) Dr. Andrew Goldberg, an anesthesiologist with a subspecialty in pain medicine; and (3) Dr. Vaughn Cohan, a neurologist (Doc. No. 37-2 at 2, 11, and 20). Each of these experts concluded Plaintiff did not have a disability preventing her from performing any occupation. Specifically:

---

[3] This was the final communication from Broadspire. Aetna took over the review of Plaintiff's disability claim from this point forward.

- Dr. Burstein found no evidence in the record that Plaintiff had ever been examined by a mental health professional or any measurement taken of her cognitive ability (Doc. No. 37-1 at 41). Dr. Burstein noted that no tests were ever conducted on Plaintiff to support her alleged cognitive issues, such as tests conducted with standardized scores (Doc. No. 37-2 at 2). In Dr. Burstein's opinion, previous medical evaluations finding Plaintiff disabled were based solely on Plaintiff's subjective complaints and were unreliable (Doc. No. 37-1 at 41).

- Dr. Goldberg found no evidence of "neurological deficit, motor weakness, or any significant functional impairment." (Doc. No. 37-2 at 9). He also noted Dr. Reithmiller's opinion is at odds with the findings of basically every other treating physician (Doc. No. 37-2 at 9).

- Dr. Cohan found that "[n]one of the medical records provided substantiates that [Plaintiff] has any impairment . . . ." (Doc. No. 37-2 at 18–19). Dr. Cohan agreed with Dr. Reithmiller's diagnosis that Plaintiff was experiencing "pain and tenderness" but disagreed that she was incapable of work (Doc. No. 37-2 at 19). To the contrary, Dr. Cohan noted that patients with similar symptoms are actually better served by performing regular sedentary work instead of remaining inactive (Doc. No. 37-2 at 19).

Based on these conclusions, Aetna upheld its decision to deny Plaintiff's disability benefits, and notified Plaintiff in March 2009 (Doc. No. 37-2 at 21).

*Plaintiff's Appeal to Alcoa*

Plaintiff filed her final appeal under the Plan to Alcoa, who ordered yet another review of Plaintiff's medical records (Doc. No. 37-2 at 32–37). Dr. Henry Spria, a neurologist, conducted the review (Doc. No. 37-2 at 37). He found, "[f]rom an objective neurological standpoint, Ms. Wooden does not meet the definition of total disability for the purposes of benefits under the [Plan]." (Doc. No. 37-2 at 36). Accordingly, the BAC denied Plaintiff's claim in November 2010 (Doc. No. 37-2 at 39). Plaintiff then filed the present action.

## STANDARD OF REVIEW

**ERISA**

The cross-Motions for Summary Judgment require this Court to review a denial of benefits by a plan administrator under 29 U.S.C. § 1132(a)(1)(B). This Court's review is "based solely upon the administrative record." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). Under this standard, the court only considers facts the plan administrator knew when the decision was made. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir.1996). The court may not consider evidence beyond the administrative record unless it supports a procedural challenge to the decision, "such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Wilkins*, 150 F.3d at 619. Because Plaintiff has not raised a procedural challenge, this Court will only consider evidence in the administrative record.

Plaintiff first contends this Court should review her denial of long-term benefits *de novo* (Doc. No. 33 at 16). The court reviews the administrator's decision using "a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If a plan gives discretion to the administrator, the court reviews its decisions under the arbitrary and capricious standard. *See Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998) (citation omitted).

The Plan clearly gives Alcoa "the discretionary authority to determine eligibility under all provisions of the plans . . . ." (Doc. No. 38-3 at 33). The Plan also gives Alcoa the power to assign responsibility to a third-party claims administrator -- in this case Aetna (Doc. No. 37-3 at 26). It is well established the arbitrary and capricious standard applies to both administrators and their fiduciaries. *See Borda*, 138 F.3d at 1066 (applying arbitrary and capricious standard to decisions of

9

the administrator or fiduciary). Even if *de novo* review applied to Aetna's decision -- which it does not -- this Court would still apply the arbitrary and capricious standard because it was Alcoa, not Aetna, who made the final decision to terminate Plaintiff's disability benefits.

The arbitrary and capricious standard is highly deferential. In fact, it is the least demanding form of judicial review of administrative action. *Abbott v. Pipefitters Local Union No. 522*, 94 F.3d 236, 240 (6th Cir. 1996). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id.* (quotation omitted).

Another way of stating this standard is whether the administrator's decision was based on a reasonable interpretation of the plan. *Shelby County Health Care Corp. v. Southern Council of Indus. Workers*, 203 F.3d 926, 933 (6th Cir. 2000). All that is required is a rational explanation in light of the plan's provisions. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). Applying this standard, the court "interpret[s] the provisions according to their plain meaning in an ordinary and popular sense." *Id.* at 711 (6th Cir. 2000) (citation omitted).

**Summary Judgment Standard**

Defendants' also moved for summary judgment on its Amended Counterclaim -- reimbursement for the overpayment of benefits -- requiring this Court to apply the standard set forth in Federal Civil Rule 56(a). Under that rule, summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the

10

evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

## DISCUSSION

### Termination of Plaintiff's Benefits

Plaintiff argues that even under the arbitrary and capricious standard, Defendants' termination of her disability benefits was improper. Not so. When Broadspire reviewed Plaintiff's disability benefits in April 2007, Plaintiff had received benefits for over 24 months. Under the Plan, Plaintiff is "totally disabled" if she could not perform "any gainful occupation" (Doc. No. 35-2 at 22).

While there is disagreement in Plaintiff's medical record, it contains sufficient evidence for Defendants to find Plaintiff was not "totally disabled" as defined by the Plan. At least seven separate medical opinions found Plaintiff capable of work at a sedentary or light level. Furthermore, Dr. Sokolski found evidence of cogwheeling and Waddel signs (Doc. No. 36-5 at 3). Given this information, Defendants' decision to terminate Plaintiff's benefits was "rational in light of the plan's provisions." *See Williams*, 227 F.3d at 712.

Plaintiff briefly attacks the credibility of these medical opinions, alleging because Defendants hired these doctors to evaluate her disability, this Court should discount their diagnoses (Doc. No. 33 at 17–18). But Defendants have every right to hire independent doctors to review Plaintiff's alleged disability. *See Cooper v. Life Ins. Co. of N. Amer.*, 486 F.3d 157, (6th Cir. 2007) (finding defendant had no obligation "to blindly accept the treating physicians' opinions"). Neither are Defendants required to automatically "accord special weight to the opinions of a claimant's physician . . . ." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

11

Plaintiff also laments the termination of her benefits despite a favorable finding by the Social Security Administration (Doc. No. 33 at 18). Plaintiff relies heavily on *Glenn v. MetLife*, 461 F.3d 660 (6th Cir. 2006), arguing that case "recognized the hypocrisy of disability insurance companies requiring claimants to apply for Social Security Disability benefits . . . then ignoring the Social Security Administrator's findings of total disability . . . ." (Doc. No. 33 at 18). But a favorable Social Security award does not automatically entitle Plaintiff to benefits under the Plan -- each has different disability criteria. *See Whitaker v. Harford*, 404 F.3d 947, 949 (6th Cir. 2005) (noting ERISA administrators are not bound by the treating physician rule).

Plaintiff incorrectly states Defendants ignored the Social Security decision (Doc. No. 33 at 18). Wrong again. Each of the reviewing doctors had access to the administrative record, which contained her Social Security decision. Aetna also specifically referenced the Social Security decision, stating that decision "did not support overturning the decision to terminate [disability] benefits." (Doc. No. 36-1 at 10).

Even if Defendants simply adopted the findings of the Social Security Administrator, termination of Plaintiff's benefits is still proper since the Administrator found "[t]he evidence supports a finding that the claimant *retains the residual functional capacity to work in sedentary postures* . . . ." (Doc. No. 36-4 at 2) (emphasis added). The employability survey and labor market survey conducted by Defendants identified several sedentary jobs, thus Plaintiff was not disabled from "any occupation" as required under the Plan to receive benefits.

Finally, Plaintiff argues Alcoa had a conflict of interest because it simultaneously administered the Plan and determined eligibility (Doc. No. 33 at 13). While this could create a conflict of interest, in this case it did not. Alcoa took multiple precautions to avoid such a conflict, including hiring an independent third party, Aetna, to handle initial claims and appeals. Alcoa also left final termination

12

decisions to the BAC, which is uncompensated and comprised of fellow beneficiaries under the Plan. "[W]here the administrator has taken active steps to reduce potential bias," such claims are given little weight. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).

This Court finds Defendants' decision to terminate long-term disability benefits under the Plan to be well-reasoned and based on a rational interpretation of the record evidence. Defendants were neither arbitrary nor capricious.

**Overpayments**

In their Amended Counterclaim, Defendants demand Plaintiff reimburse the Plan for an overpayment of $22,016.20 -- plus interest, attorney's fees, and costs -- because she received Social Security benefits in addition to disability benefits under the Plan (Doc. No. 31 at 2–3). Section 1132(a)(3) allows fiduciaries to "obtain equitable relief . . . to enforce any provisions . . . of the plan." Defendants are fiduciaries of the Plan and the Plan clearly provides Plaintiff "must arrange to repay the company for any overpayment of disability benefits . . . ." (Doc. No. 35-2 at 14). Under the Plan, an overpayment results when Plaintiff receives both long-term disability benefits from the Plan, and "benefits from any other source," including retroactive payments from the Social Security Administration (Doc. No. 35-2 at 14).

Plaintiff admits receiving $859 per month from Social Security since January 1, 2004, and disability benefits from the Plan since February 7, 2004 (Doc. No. 32 at 2). The Plan began offsetting this award on October 1, 2006 (Doc. No. 35-2 at 5). Based on the per month benefit, Plaintiff received $27,316.20 in overpayment (31 full months at $859 + one partial month at $687.20) (Doc. No. 35-2 at 5–6). $5,300 of Plaintiff's Social Security disability award was used to pay for legal expenses (Doc. No. 35-2 at 6). According to the Plan, legal expenses are subtracted from the amount

13

of reimbursement owed (Doc. No. 35-2 at 14). Thus, if Defendants are correct, Plaintiff still owes $22,016.20, and Defendants' Motion for Summary Judgment must be granted.

Plaintiff disputes the overpayment of disability benefits (Doc. No. 33 at 18–20). In support, Plaintiff relies on *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), arguing "29 U.S.C. § 1132(a)(3) only permits recovery of 'appropriate equitable relief,' which excludes legal restitution." (Doc. No. 33 at 18). Defendants claim reimbursement is equitable in nature and therefore authorized under Section 1132(a)(3) (Doc. No. 42 at 11). "Whether [reimbursement] is legal or equitable depends on 'the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought." *Great-West*, 534 U.S. at 213 (quoting *Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994)).

The court determined in *Great-West* that at least some of these claims for reimbursement are legal in nature and therefore not appropriate under Section 1132(a)(3). *Great-West*, 534 U.S. at 212 ("[N]ot all relief falling under the rubric of restitution [was] available in equity."). In that case, Great-West paid over $400,000 in medical expenses to a beneficiary. *Id.* at 207. The beneficiary later sued various third parties in tort and entered a $650,000 settlement agreement. *Id.* at 207–08. Great-West filed an action in federal court seeking to enforce the reimbursement provision of its plan, requiring beneficiaries to repay proceeds recovered from third parties. *Id.* at 208. The court denied Great-West's claim and held:

> The basis for petitioners' claim is not that respondents hold particular funds that, in good conscience belong to petitioners, but that petitioners are contractually entitled to *some* funds for benefits that they conferred. The kind of restitution that petitioners seek, therefore, is not equitable . . . but legal -- the imposition of personal liability for the benefits that they conferred upon respondents.

*Id.* at 214.

14

However, *Great-West* is not on all fours with the instant case. The court further explained Great-West's claim for reimbursement failed "because 'the funds to which petitioners claim[ed] an entitlement' were not in Knudson's possession, but had instead been placed in a 'Special Needs Trust' under California law." *Sereboff v. Mid. Atl. Med. Servs., Inc.*, 547 U.S. 356, 362 (2006) (quoting *Great-West*, 534 U.S. at 214). Unlike *Great-West*, where the insurance company sought reimbursement against any future settlements, regardless of their source, Defendants here seek money already in Plaintiff's possession.

In a similar case, the Sixth Circuit held reimbursement of overpayments from Social Security benefits is equitable in nature where "the plan specifically identified a particular fund distinct from [Plaintiff's] general assets . . . and a particular share of that fund to which the plan was entitled . . . ." *Gilchrest v. Unum Life Ins. Co. of Am.*, 255 Fed. App'x 38, 45 (6th Cir. 2007). In *Gilchrest*, that criteria was met when the plan simply stated:

> Unum has the right to recover any overpayments due to:
> • fraud;
> • any error Unum makes in processing a claim; and
> • your receipt of deductible sources of income.
>     You must reimburse us in full. We will determine the method
>     by which the repayment is to be made.
> Unum will not recover more money than the amount we paid to you.

*Id.* at 45.

Likewise, and frankly with even more specificity, the Plan here identifies overpayments, limits the recovery amount to the total benefits provided under the Plan, and identifies Social Security benefits in Plaintiff's possession as reimbursable (Doc. No. 35-2 at 13–14). Thus, Defendants' reimbursement claim is equitable in nature and proper under Section 1132(a)(3).

15

Plaintiff offers assorted arguments against Defendants' claim for reimbursement.[4] These fail as well. First, she opposes repayment based on her allegation that Defendants breached their fiduciary duty to provide her with disability benefits (Doc. No. 32 at 3–4) (third and fifth affirmative defenses). That argument merely rehashes Plaintiff's claim that Defendants arbitrarily and capriciously terminated her benefits. For the reasons explained above, that argument fails. Whether or not Defendants terminated Plaintiff's benefits arbitrarily and capriciously has nothing to do with whether Plaintiff received an overpayment. *See Gilchrest*, 255 Fed. App'x at 46 (finding recovery of overpayments proper even though termination of benefits was arbitrary and capricious). Even if this Court reinstated Plaintiff's benefits, she would still owe reimbursement under the Plan.

Second, Plaintiff claims Social Security benefits are protected from reimbursement by statute (Doc. No. 33 at 19). Plaintiff cites to 42 U.S.C. § 407(a) in support:

> The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

But the Sixth Circuit has recently clarified that Section 407 only prevents a district court from imposing a lien on future Social Security benefits -- it does not prevent a plan's right to recover overpaid benefits. *Hall v. Liberty Life Assurance Co. of Boston*, 595 F.3d 270, 275 (6th Cir. 2010).

---

[4] Defendants also argue that Plaintiff cannot prevail on her claim that Alcoa failed to provide Plan documents in violation of 29 U.S.C. § 1104 (Doc. No. 35-1 at 26–28). Defendants state this claim is contained in the Complaint at Paragraphs 10 and 28; but the Complaint does not contain this allegation. Paragraph 10 merely states "Defendants reserve the right to have an examination conducted by a doctor of its choice at no cost to Plaintiff ," and Paragraph 28 does not exist. If this claim exists anywhere, it is in Plaintiff's fourth affirmative defense to Defendants' Amended Counterclaim (Doc. No. 32 at 4). Plaintiff has failed to reassert this claim in its Motion for Summary Judgment. This Court cannot address a nonexistent claim.

16

Thus, Defendants are entitled to reimbursement for the Social Security benefits paid from February 7, 2004 until October 1, 2006 -- $22,016.20.

### Interest, Fees, and Costs

In addition to reimbursement, Defendants ask this Court for pre and postjudgment interest, as well as attorney's fees and costs. These requests are denied.

An award of interest is discretionary. *Drennan v. Gen. Motors Corp.*, 977 F.2d 246 (6th Cir. 1992). Generally, awarding interest is appropriate where mere reimbursement does not make a party whole because that party has been denied the use of money rightfully his. *Wells v. U.S. Steel*, 76 F.3d 731, 738 (6th Cir. 1996) (deciding whether to award interest to administrator who overpaid benefits to ERISA beneficiary). But that is no "law of the Medes and Persians." Indeed, the court in *Wells* denied prejudgment interest because "the Fund *voluntarily* overpaid and . . . was in a position to control the amount of the setoff." *Id.* Here, Defendants learned of Plaintiff's Social Security award in March 2006, when they received the Social Security decision as part of Plaintiff's appeal (Doc. No. 36-4 at 7). Defendants did not offset Plaintiff's award until October 2006, nearly seven months later (Doc. No. 36-4 at 39–40), voluntarily overpaying Plaintiff over $5,000.

Likewise, the award of attorney's fees and costs is also discretionary. 29 U.S.C. § 1132(g). An award of attorney's fees in the ERISA context is guided by the five-factor test set forth in *Sec'y of Dept. of Labor v. King*, 775 F.2d 666, 669 (6th Cir. 1985):

1. the degree of the opposing party's culpability or bad faith;
2. the opposing party's ability to satisfy an award of attorney's fees;
3. the deterrent effect of an award on other persons under similar circumstances;
4. whether the requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and
5. the relative merits of the parties' positions.

17

However, this test is not exhaustive. This Court may analyze additional factors, and even find some of the *King* factors inapplicable. *See Armistead v. Venitron Corp.*, 944 F.2d 1287, 1303–04 (6th Cir. 1991) (discussing the purpose behind the fee-shifting provision in Section 1132(g)). Defendants' have provided this Court with no argument on any of these elements. Their Motion for Summary Judgment, like their Amended Counterclaim, simply asks this Court to enter judgment for attorney's fees, and costs (Doc. Nos. 35-1 at 30; 31 at 4). Not so fast.

The record contains no evidence of Plaintiff's bad faith or ability to pay-- the first and second factors -- and this Court seriously doubts Plaintiff has such ability. The third factor, deterrence value, seems irrelevant. *See Sheldon Co. Profit Sharing Plan and Trust v. Smith*, 844 F. Supp. 1176, 1178 (W.D. Mich. 1994) (shifting fees in a private suit "hardly constitutes a deterrent"). The fourth factor has some merit because any fees collected would be for the common benefit of the Plan. However, without knowing how much these fees would be, how large the fund is, and having doubts about collectability to begin with, this Court cannot assess what benefit would actually be conferred. As to the fifth factor, Plaintiff's case "appears no more devoid of merit than that of any other losing litigant." *Armistead*, 944 F.2d at 1304.

## CONCLUSION

For the forgoing reasons, this Court finds Defendants' decision to terminate Plaintiff's disability benefits was proper and, further, Defendants are entitled to reimbursement of $22,016.20 for the overpayment of benefits. Accordingly, Plaintiff's Motion (Doc. No. 33) is denied and Defendants' Motion (Doc. No. 35) is granted.

IT IS SO ORDERED.

   s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

January 31, 2012